UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


EDWARD JAMES CROMER,

   Plaintiff,

v.               Case No. 2:08-cv-203
                HON. ROBERT HOLMES BELL
P. CARBERRY, et al.,

   Defendants.

_____/


## REPORT AND RECOMMENDATION

  Plaintiff Edward James Cromer, a/k/a Bu'cay Shabazz, an inmate at the Alger Maximum Correctional Facility (LMF), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Case Manager P. Carberry, Mail Room Officer S. Andrews, Guard V. Killips, Guard T. Lancour, Guard D. Bergh, Guard B. Bowerman, Guard C. Miron, Guard Unknown Santure, Guard M. Rondeau, Chaplain G. Riley, Doctor Unknown Frontera, Health Care Supervisor Unknown Cheatham, and Inspector Unknown Contreras.

  Plaintiff alleges in his complaint that he is a member of the Nation of Islam and has been registered as a Muslim since 1993. Plaintiff states that a Muslim religious name is central to his religious creed. On January 19, 2007, Defendant Bowerman called Plaintiff "Ed" during religious services, causing other inmates to go into a "frenzy." Plaintiff saw this and quickly called for prayer. On January 20, 2007, Defendant Bowerman stated that Plaintiff should not be out of the hole because Plaintiff does not like White women. Defendant Bowerman then falsified a major misconduct ticket on Plaintiff for "disobeying a direct order" in order to have Plaintiff placed in solitary confinement. Plaintiff claims that Defendant Bowerman never mocked the religious names

of prisoners who are Arab, Jewish, or Christian and that Defendant Bowerman is attempting to spark violence with the Muslims and spread religious bigotry.

Plaintiff alleges that on June 22, 2007, Defendant Bowerman delivered unsealed legal mail involving a pending civil action. Plaintiff confronted Defendant Bowerman about the legal mail, but Defendant Bowerman refused to respond. On June 23, 2007, Defendant Bowerman falsified a major misconduct, stating:

> While on B-wing across from prisoner Cromer 211902 Cell 216, I could see Prisoner Cromer staring at Killips licking his lips and making rude gestures of sexual nature with his tongue towards [Defendant] Killips. [Defendant] Killips had her back towards Cromer door. I told prisoner Cromer to stop doing this and he said, "I can look if I want to."

(*See* Plaintiff's complaint, ¶ 23.) Plaintiff was found guilty following a hearing and was sentenced to 30 days loss of privileges. Plaintiff claims that during the preceding six months, Defendant Bowerman was heard stating that she hated men. Plaintiff further states that he has a protected right to look at a white woman.

On June 23, 2007, Defendant Santure told Plaintiff that if he wanted to look at white women, Defendant Santure would "kick [Plaintiff's] ass." Defendants Santure, Bowerman, Killips and other prison officials stood in front of Plaintiff's cell yelling racial and disparaging remarks. Defendant Santure then allegedly wrote a false misconduct ticket for "threatening behavior." On August 15, 2007, Defendant Bowerman told Plaintiff that if he wrote Defendants up, Plaintiff would find out that Defendants wrote better, that they ran the U.P. and that Plaintiff was not to look at Defendant Killips. Defendants had a practice of making black inmates bow their heads toward the ground in the presence of white female staff members.

In February of 2007, Plaintiff's mother sent him $30.00 to be used as a down payment for typewriter repairs to be paid to Lake Superior Inc. (LSI). On May 21, 2007, Officer Olger came to Plaintiff's cell with a letter from LSI. This letter was not in an envelope and stated "Cromer was unhappy with the prices, typewriter is being returned unrepaired." Plaintiff states that he was never given an estimate of the repair. Plaintiff wrote to LSI three times seeking an explanation, but he never received a response. Plaintiff believes that Defendants Bergh and Andrews deprived him of his mail from LSI. Plaintiff claims that when he attempted to contact LSI, Defendants Bergh and Andrews threatened him with a major misconduct. Plaintiff's mother called LSI complaining about the status of the requested repair and was told that LSI no longer did business with LMF. However, LSI sent an estimate of the repair cost for Plaintiff's typewriter. Plaintiff states that Defendants had previously planned to destroy Plaintiff's typewriter and blame him for it, but had not had the opportunity. Defendant Rondeau had stated in the past that he "was going to destroy Plaintiff's typewriter because Plaintiff was using it to recruit by corresponding with Muslims," and that Defendant Rondeau also did not approve of the fact that Plaintiff stored legal research on his computer.

On June 8, 2007, Plaintiff received a hearing in which it was determined that his typewriter was not contraband and had been returned from LSI unrepaired. On June 23, 2007, Defendant Bowerman issued a property slip for the typewriter, which did not reflect that it had been broken. However, later that day, Officer Albright issued a minor misconduct ticket for a cracked cassette tape. When Plaintiff was released from administrative segregation, he found a notice of intent written by Defendant Carberry at the bottom of a duffel bag of non-allowable administrative segregation property, which falsely stated that Plaintiff had received a hearing on his typewriter on July 12, 2007. On February 20, 2008, Plaintiff filed an action in small claims court against

Defendant Carberry for destroying his typewriter. Defendant Carberry wrote a notice of intent stating that the typewriter was broken.

On June 4, 2007, Defendant Miron falsified a misconduct on Plaintiff for improperly passing an item to prisoner Overton #253325. The following day, Defendant Miron told Plaintiff that Overton would beat the misconduct ticket, but that Plaintiff would be kept on loss of privileges. As predicted by Defendant Miron, Plaintiff was found guilty of his misconduct, but prisoner Overton was not. On June 15, 2007, Defendant Miron illegally removed two pages of legal mail without a hearing.

Plaintiff also claims that Defendants Carberry and Contreas engaged in a campaign of breaking down enemies, such as Plaintiff, by falsifying a string of major and minor misconduct tickets, force feeding by not allowing prisoners enough time to eat their meals, and getting "in Plaintiff's face" and yelling, shouting and spitting. As a result, Plaintiff developed ulcers, inflammation, hernias, excessive bleeding from his rectum, dizziness, gallstones and constipation. Plaintiff states that Defendant Contreas used intimidation tactics in order to force Muslims to denounce their religious beliefs and avoid religious meetings. On September 6, 2007, Defendant Frontera wrote a detail so that Plaintiff could lift weights and use the gym as part of his treatment for high blood pressure, high cholesterol, atrophic muscle mass, liver disease, and aphagia (the inability or refusal to swallow). Plaintiff alleges that on September 5, 2007, Plaintiff was rushed to the prison infirmary because his throat had swollen up after being forced to eat to quickly. Defendant Frontera subsequently ordered that Plaintiff be given a full 20 minutes to eat his meals.

Plaintiff asserts that as a result of being shot three times in 1986, he suffers from drop foot and requires high top soft leather crepe soled shoes, as well as an "AFO Brace." However, Defendant Frontera discontinued Plaintiff's special accommodation for the high top shoes and

Plaintiff was required to wear state issue shoes. Plaintiff's state issue shoes wore out after two weeks because of his gait, and Plaintiff began to suffer from back pain and spasms.

Plaintiff claims that Defendant Riley told him to read the Bible or the Koran instead of the "Supreme Wisdom lessons" which had been purchased from the prior prison chaplains. Plaintiff explained that the Bible was written to reform white people and the Koran was written to reform Arabs, but the Supreme Wisdom lessons came from God to assist black people. The Supreme Wisdom lessons were sent to North America in 1910 by Alphonso Shabazz, one of the founders of the Nation of Islam. Plaintiff contends that the Supreme Wisdom lessons are controversial because they provide the black man with a method to trace himself back to a time of universal greatness. Plaintiff states that Defendant Riley refused to allow Plaintiff to have copies of the Supreme Wisdom lessons made from another prisoner, but that Defendant Riley provides such copies of Christian, Shiite, and Sunni materials to prisoners.

Plaintiff is Security Threat Group II and cannot have a prison job, so is unable to purchase his own copy of the Supreme Wisdom lessons. Defendant Riley states that to provide a copy of the Supreme Wisdom lessons would be a violation of federal law. However, Defendant Riley admits that he violated federal law several times. Plaintiff claims that Defendant Riley is depriving him of the Supreme Wisdom lessons in order to discriminate against him on the basis of his race.

Plaintiff claims that Defendants' conduct violated his rights under the First, Eighth and Fourteenth Amendments. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

On March 19, 2009, the court dismissed Plaintiff's claims against Defendants Carberry, Andrews, Lancour, Bergh, Miron, Rondeau, Frontera, Cheatham, and Contreras and

ordered service on the remaining Defendants.  (Docket #9 and #10.)  Presently before the Court is the Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), and / or Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56, filed by Defendants Killips, Bowerman, Santure, and Riley.  Plaintiff has filed a response and the matter is ready for decision.  Because both sides have asked that the Court consider evidentiary materials beyond the pleadings, the standards applicable to summary judgment apply.  *See* Fed. R. Civ. P. 12(b).

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.  *Id.* at 324-25.  The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  The evidence must be viewed in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true.  *Muhammad v. Close***,** 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)).  However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient.  *Anderson*, 477 U.S. at 251-52.  Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue

of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Initially, Defendants assert that the incident which allegedly occurred on January 19, 2007, was not exhausted through the prison grievance process, so that claims arising from this incident should be dismissed. A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 127 S. Ct. 910, 919-21 (2007). A moving party without the burden of proof need show only that the opponent cannot sustain his burden at trial. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PRLA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007); *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 127 S. Ct. at 922-23.

MDOC Policy Directive 03.02.130 (effective Dec. 19, 2003)[1], sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control *Id.* at ¶ R. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶¶ R, X. The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly. Information provided shall be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).

---

[1] The MDOC amended Policy Directive 03.02.130 on July 9, 2007. However, the 2003 version of the policy directive was in effect at all times applicable to this lawsuit.

Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ T (emphasis in original). The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ Y.

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within five business days of the response, or if no response was received, within five days after the response was due. *Id.* at ¶¶ R, DD. The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a medical care grievances. *Id.* at ¶ FF. If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶¶ R, HH. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ HH. The Prisoner Affairs Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ II. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ U. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall be completed within 90 calendar days unless an extension has been approved . . . ." *Id.*

In addition, the grievance policy provides that, where the grievance alleges staff brutality or corruption, the grievance may be submitted directly to Step III. *Id.* at ¶S. In such instances, the grievance must be filed within the time limits prescribed for filing grievances at Step I. *Id.*

Defendants state that while Plaintiff claims that Defendant Bowerman caused Muslim prisoners to go into a frenzy by kicking on the door and yelling "Ed!" during a Muslim religious observance on January 19, 2007, he never filed a grievance regarding the alleged incident. In support

of this assertion, Defendants attach a copy of a grievance inquiry report for Plaintiff, as well as copies of the grievances Plaintiff filed on January 15, January 18, and January 20, 2007, none of which address the January 19, 2007, incident. (Defendants' Exhibits A, B, C, and M.) A review of the attached grievances reveals that Plaintiff did not file a grievance on Defendant Bowerman for the January 19, 2007, incident. Therefore, in the opinion of the undersigned, Defendant Bowerman is entitled to summary judgment with regard to the January 19, 2007, incident for failure to exhaust administrative remedies.

Defendants also assert that they are entitled to summary judgment because they did not violate Plaintiff's equal protection rights. To establish a violation of the Equal Protection Clause, a prison inmate must prove that a discriminatory intent or purpose against a disfavored class or excluded group was a factor in an action taken by prison officials. *See McCleskey v. Kemp*, 481 U.S. 279 (1987); *Heckler v. Mathews*, 465 U.S. 728 (1984); *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 265 (1977). The typical case involves allegations that state officials have discriminated on the basis of race or gender. As noted above, Plaintiff claims that Defendants Bowerman, Killips and Santure treated him differently than similarly situated prisoners on the basis of his race.

Defendants attach their affidavits in support of this assertion. Defendant Bowerman attests that on June 23, 2007, she issued a major misconduct report on Plaintiff for sexual assault. Defendant Bowerman denies ever stating that Plaintiff exposed himself to Defendant Killips. (Defendants' Exhibit N, ¶ 3.) Defendant Killips attests that on June 23, 2007, she had her back to Plaintiff when Defendant Bowerman told Plaintiff to stop what he was doing. Defendant Bowerman then informed Defendant Killips that Plaintiff had been making sexual gestures towards her. Defendant Killips then told Plaintiff to stop and he responded that he could look if he wanted.

Defendant Killips informed Plaintiff that simply looking was okay, but that making sexual gestures towards an officer is grounds for a sexual misconduct ticket. Plaintiff then became disruptive and Defendant Santure came down to Plaintiff's cell to help deescalate the situation. (Defendants' Exhibit O, ¶¶ 3-8.) Defendant Santure attests that on June 23, 2007, Defendant was working on Spruce Unit when Plaintiff returned from chow. While locking up, Plaintiff was standing at his cell door yelling, so Defendant Santure told him to stop yelling. Plaintiff then stated: "Fuck you racist motherfucker. Open this fucking door so I can beat your pink ass." During this time, Plaintiff was looking at Defendant Santure in a threatening manner. Defendant Santure then wrote a major misconduct on Plaintiff for threatening behavior. (Defendants' Exhibit P, ¶¶ 3-6.)

Defendants attach copies of the major misconduct reports and hearing reports for the June 23, 2007, incident. In the reason for the guilty finding on the sexual misconduct charge, the hearing officer stated:

> On 6/23/07 the prisoner was licking his lips while looking at Killips. This action, which was sexual in nature, was done to harass and degrade another officer, Bowerman, who was watching the prisoner. Prisoner intended to degrade and harass as the prisoner continued his actions after Bowerman told him to stop doing that. Prisoner was put on notice that his lip licking was offensive and he continued with it. Prisoner claims that the officer's misconduct was "motivated by lesbian desire" and that the words "licking" and "tongue" are "lesbian terms." He further wrote, "I believe [Corrections Officer] Bowerman seen an opportunity to showcase her muscles and impress the young [Corrections Officer] Killips and show Killips "It's okay, I wouldn't leave you alone." Prisoners's concentration on the officer's motivations, if anything, appears to be an implicit acknowledgment that the officer's claims are true. There would be no reason for the officer to "showcase her muscle and impress" unless the prisoner was doing exactly what the officer had stated he had done. Prisoner's degrading comments about the officer only added credibility to her claims that this incident had occurred. The officer claimed that the prisoner was treating another officer with disrespect and the prisoner's written comments continued with this lack of respect. Reporting staff member factual and is credible as to what occurred.

Prisoner's sexual acts towards another officer support the charge when the prisoner continued with his actions after the officer told him to stop, even though it appears that the officer that was the object of the prisoner's abuse was unaware of his actions. Prisoner's continued behavior was done with the intent to harass and degrade the officer watching the prisoner. Charge upheld.

(Defendants' Exhibit D-1.)

In the reason for the guilty finding on the threatening behavior charge, the hearing officer stated:

VIDEO: Prisoner wanted the hearing investigator to view the video and "describe what you see on the camera . . . during chow lines in Spruce unit." The video is irrelevant. The prisoner was in his cell when the incident occurred and the video has no audio. The video would not prove one way or the other if the prisoner was threatening staff in his cell. No error in not providing.

DISQUALIFICATION: Prisoner's generalized complaints about the Hearing Officer do not establish a factual basis to find bias.

NOTE: Prisoner's statement appears to be a copy of a pleading he filed or intends to file in a lawsuit. The attachments mentioned in his statement were not attached to the statement. Prisoner's request for an extension of time has no applicability to this hearing.

QUESTIONS: Prisoner's questions are rhetorical in nature and do not require a response.

THREAT: On 6/23/07 the prisoner stated to the officer, "Fuck you, racist motherfucker. Open this fucking door so I can beat your pink ass." This expressed the intent to physically assault the officer. Prisoner intended to cause fear of physical harm in the officer as he directed his comment to the officer when the officer told him to stop yelling. Prisoner claims that the officer fabricated this misconduct report because "Mr. Cromer a blackman looked at [Corrections Officer] Killips a white woman." Prisoner is not believed. First, throughout his statement, he referred to staff as being racist. This would be consistent with the officer's claims as to what the prisoner had stated at the time of the incident. Second, the prisoner described how there was a "frenzy stirring . . . about the issue whether prisoners can look at women staff" as he was returning back to his cell from the evening meal. Again, that and prisoner's obvious anger, would be

consistent with the officer's claims that the prisoner was yelling as the officer was locking up the prisoner from chow lines. Reporting staff member factual and is credible as to what occurred. Prisoner's statement, if anything gave context and brought the officer's misconduct report to life. Charge upheld.

(Defendants' Exhibit E-1.)

In response to Defendants' motion for summary judgment, Plaintiff offers the affidavits of fellow prisoners, including an affidavit from prisoner Corey A. Askew, who attests that he overheard Defendant Bowerman yell at Plaintiff, stating "Don't be looking at Killips, don't be looking at her, that is my girl." Askew also attests that he heard different corrections officers telling Plaintiff that black inmates who look at white women offend several prison staff members. (Plaintiff's Exhibit 3, p. 6.) Prisoner Bobby Overton attests that he locks across the hall from Plaintiff and that he observed Defendant Bowerman telling Plaintiff to stop looking at her girl, and overheard Defendants Killips and Santure making racial comments and telling Plaintiff he was going to the hole. (Plaintiff's Exhibit 3, p. 7.) Prisoner Jessie Moon attests that he is Caucasion and that while he was in segregation, Defendants Bowerman and Killips, as well as other white prison officials watched him masturbate and never wrote him a misconduct. (Plaintiff's Exhibit 3, p. 9.) Finally, Prisoner Churn's witness statement which was given during the investigation on the misconduct tickets indicates that Plaintiff never threatened Defendant Santure. (Plaintiff's Exhibit 3, p. 12.)

In the opinion of the undersigned, Plaintiff has offered sufficient evidence to show the existence of a genuine issue of material fact. Therefore, the undersigned recommends that Defendants Bowerman, Killips and Santure be denied summary judgment.

As noted above, Plaintiff states that Defendant Riley refused to allow Plaintiff to have copies of the Supreme Wisdom lessons made from the Supreme Wisdom lessons belonging to

another prisoner, but that Defendant Riley provides such copies of Christian, Shiite, and Sunni materials to prisoners. Plaintiff claims that Defendant Riley was motivated by a desire to discriminate against him on the basis of his religious beliefs.

Defendant Riley attests in his affidavit that he provides religious materials to prisoners free of charge when the materials have been donated to him for distribution. Before they became copyrighted materials, "Supreme Wisdoms" was available to prisoners who paid for copies of the lessons they wanted. The publication has since been copyrighted. Therefore, copying the materials is no longer permitted. However, prisoners can now obtain the lessons through "Final Call Magazine." (Defendants' Exhibit Q, ¶¶ 3-5.) In the opinion of the undersigned, the evidence shows that Defendant Riley's denial of Plaintiff's request for copies of the Supreme Wisdom lessons was not based on Plaintiff's religious beliefs. Therefore, the undersigned recommends that Defendant Riley be granted summary judgment.

Defendants alternatively move for qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 816. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id.* As previously discussed, because Plaintiff cannot establish that his constitutional rights were violated, Defendants are entitled to qualified immunity.

Finally, Defendants assert that Plaintiff cannot maintain an action for compensatory damages for mental or emotional injury without a showing of a prior physical injury. Section § 1997e(e) provides as follows:

> No federal action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

*Id.* The Sixth Circuit repeatedly has held, albeit in unpublished decisions, that Eighth Amendment claims for monetary relief based on mental or emotional injury are precluded by § 1997e(e) absent a showing of physical injury. *See, e.g.*, *Merchant v. Hawk-Sawyer*, No. 01-6244, 2002 WL 927026, at *2 (6th Cir. May 7, 2002); *Garrison v. Walters*, No. 00-1662, 2001 WL 1006271, at *2 (6th Cir. Aug. 24, 2001); *Robinson v. Corrections Corp. of America*, No. 99-5741, 2001 WL 857204, at *1 (6th Cir. June 20, 2001); *Oliver v. Sundquist*, No. 00-6372, 2001 WL 669994, at *2 (6th Cir. June 7, 2001); *Williams v. Ollis*, Nos. 99-2168, 99-2234, 2000 WL 1434459 (6th Cir. Sept. 2000); *Raines-Bey v. Garber*, No. 99-1471, 2000 WL 658721, at *1 (6th Cir. May 12, 2000). The Second and Fifth Circuits also have found that § 1997e(e) applies to constitutional claims. *See Thompson v. Carter*, 284 F.3d 411 (2d Cir. 2002) ("Because the words 'federal civil action' are not qualified, they include federal civil actions brought to vindicate constitutional rights."); *Searles v. Van Bebber*, 251 F.3d

869 (10th Cir. 2001) (applying § 1997e(e) to constitutional claims, including First Amendment religion claims); *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001). However, Plaintiff does not base his claim for damages on a mental or emotional injury. Therefore, Defendants' contention lacks merit.

In summary, in the opinion of the undersigned, Defendants' Motion for Summary Judgment is properly granted, in part. Accordingly, it is recommended that Defendants'Motion for Dismissal and/or Summary Judgment (Docket #30) be granted with regard to Defendant Riley. In addition, Defendant Bowerman is entitled to dismissal without prejudice for lack of exhaustion. Finally, the undersigned recommends that Defendants Killips and Santure be denied summary judgment.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  February 1, 2010